In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2515

RONALD RUHL,

*Petitioner-Appellant*,

*v.*

MARCUS HARDY,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08-cv-4980 — **James F. Holderman**, *Judge.*

ARGUED JANUARY 9, 2014 — DECIDED FEBRUARY 21, 2014

Before MANION and SYKES, *Circuit Judges*, and GRIESBACH, *District Judge.*[*]

GRIESBACH, *District Judge.* Ronald Ruhl appeals the district court's denial of his petition for a writ of habeas corpus. Ruhl and Raymond Serio were convicted of the first-degree murder of Richard Neubauer in separate trials in Lake County, Illinois.

[*] Of the Eastern District of Wisconsin, sitting by designation.

After exhausting his state court remedies, Ruhl filed a petition for federal relief under 28 U.S.C. § 2254, alleging that his conviction was the result of violations of various constitutional rights. The district court issued a thorough decision in which it denied his petition and declined to issue a certificate of appealability. We granted a certificate as to Ruhl's claim of ineffective assistance of counsel and now affirm.

**I.**

On the morning of January 6, 2002, Richard Neubauer's body was found in his mother's car, which was parked at the entrance to the Bristol Renaissance Faire, just over the Illinois/Wisconsin border in Kenosha County, Wisconsin. A medical examiner concluded that Neubauer died from two gunshot wounds to the head and one to the neck. The investigation soon focused on the Whip Lash bar in Antioch, Illinois, which was operated by Serio and frequented by Ruhl, Serio's close friend and companion. Neubauer had planned to pick up Denise Schubat, his girlfriend who worked as a bartender there, after she finished her shift at around 2:30 a.m. that morning. He left his parents' home at approximately 1:45 a.m. and never returned.

Neubauer was the father of Schubat's daughter, but the couple had separated sometime after the child's birth in August 1998. Neubauer had continued to visit his daughter, however, and sometime in November 2001, he began seeing Schubat again. After they resumed their relationship, Neubauer often picked Schubat up at the end of her shift.

When first questioned by police, Schubat denied any knowledge of the murder and claimed that Neubauer had

failed to show up at the end of her shift. Schubat claimed she had driven her own car directly home and called Neubauer's cell phone at approximately 2:43 a.m. She left a message stating in effect that she assumed he had stayed in the city, that she had driven herself home, and that she would talk to him later. When Neubauer's mother called her later that morning inquiring about her son's whereabouts, Schubat told her that she had not heard from him. She told the police the same thing. Three months later, however, on April 4, 2002, Schubat's story changed dramatically after police confronted her with evidence that she was present at the time Neubauer was shot. Schubat then gave a statement implicating Ruhl and Serio. Shortly thereafter, Ruhl and Serio were both charged with Neubauer's murder, and Schubat became a key witness against them in their separate trials.

According to Schubat, Serio had been pursuing a sexual relationship with her since shortly after he hired her to tend bar at the Whip Lash in August 2001. On one occasion in late October 2001, before she had resumed her relationship with Neubauer, Schubat had gone with Serio to a motel where they used cocaine and had sexual relations. When Serio invited her to his motel room the next day, Schubat told him the previous night was a mistake. According to Schubat, Serio was unhappy with her decision and continued to pursue her even after she resumed her relationship with Neubauer.

Ruhl was Serio's friend. Schubat testified that the two were always together, and Ruhl would frequently drive Serio to work and run errands for him. Ruhl was also doing some remodeling at the bar and owed Serio a substantial amount of money. Schubat testified that the two used "direct-connect"

Nextel cellular telephones that had a two-way radio feature which they used to communicate with each other every night.

Schubat testified that while at work about a week before Neubauer's murder, she overheard Serio say to Ruhl that they were going to kill Neubauer. Ruhl responded that he would go along with it as long as Schubat would not get mad at him. Schubat testified that they were both laughing at the time, and she thought they were joking. She told them they were crazy and went back to work.

Over the following week, Serio continued to press Schubat to go out with him. On each occasion, Schubat refused, explaining that she was with Neubauer. In fact, Schubat testified that she spent almost every night during the week with Neubauer at his parents' house. On the evening of January 4, 2002, Serio again asked Schubat to go out with him after work, and Schubat again refused, stating she was going out with Neubauer. Serio then asked her to call him when she got home so he knew she was safe and not with Neubauer anymore. When Schubat asked Serio why he wanted to know that, Serio said he was going to kill Neubauer. Schubat testified that again she did not take Serio seriously because he was laughing and joking at the time he said it.

When Schubat arrived at work the following night, Serio asked her why she did not call him when she got home earlier that day. Schubat told him she was busy, and Serio stormed away. He later returned and began questioning her about where she was and what she and Neubauer were doing. Schubat responded that they had gone to a friend's house and arrived home late, but it really was none of his concern. Serio

made a comment about getting rid of Neubauer so Schubat could be with him, to which Schubat responded that he was crazy and they would never be together.

At approximately 10:00 p.m., Serio met with Ruhl in the back kitchen area of the bar where they remained talking for between 30 and 40 minutes. When Schubat poked her head in at one point, the two stopped talking. Serio later returned to the bar, and Ruhl left by another door that led to the parking lot. Later that evening Schubat also noticed that a handgun she had previously seen in one of the drawers behind the bar was missing.

After the bar closed at 2:00 a.m., Schubat began cleaning up. Neubauer previously told her that he planned to go to a party at a friend's house that evening, but would pick her up after her shift ended and take her back to the party with him. Schubat had driven her own car to work so that if his plans changed she could drive directly home. As she was cleaning up, Schubat heard Serio talking with Ruhl over their Nextel phones with the two-way radio feature about a car in the parking lot that fit the description of Neubauer's mother's car. Schubat told Serio that must be Neubauer and that she had to go. At that point, Serio told Ruhl to go up to the car window and shoot Neubauer. Again Schubat did not believe Serio was serious. She finished counting her tips, grabbed her coat, and started to leave. Serio pushed her behind the bar and told her she wasn't going anywhere. He then instructed Ruhl to go knock on the window and pull the trigger. Schubat testified she heard Ruhl ask, "Are you sure?" and Serio screamed into the phone, "I want to hear a gunshot." Thirty seconds later, Schubat heard a gunshot. She jumped over the bar and ran to

the window. When she looked out, she saw Neubauer sitting in his car slumped over.

Schubat testified that at that point she collapsed. Serio picked her up, sat her on the pool table, and began shaking her and telling her to calm down and relax. He told her she couldn't be mad at him because he didn't do it. Shortly thereafter, she heard pounding on the door and glass breaking. Serio then opened the door, and Ruhl came in. After Ruhl entered, Schubat saw the gun she had previously noticed missing lying on the bar, and Ruhl began pacing back and forth. Ruhl then told Serio that they had to hurry and get rid of the body. Serio told Schubat to go home and make sure no one knows that Neubauer came to pick her up. According to Schubat, Serio threatened to harm her and her daughter if she told anyone what happened. Serio also instructed Schubat to call Neubauer's cell phone to check in once she arrived at her home. Schubat then proceeded to her car with Serio watching her. She immediately drove to her home and, as instructed, called Neubauer's cell phone and left the message described above when she arrived.

After Neubauer's body was discovered, and in the days and weeks that followed, Schubat was questioned by police and repeatedly told them that Neubauer had never arrived at the Whip Lash after closing on January 6, 2002. She testified that she continued to lie to police because she was terrified of Serio and Ruhl and thought they would harm her daughter if she told the truth. She said she had enjoyed a close relationship with Neubauer at the time he was murdered and claimed the first time she realized Serio was serious about killing him was when he told Ruhl to shoot him just before he did so.

The State presented two other witnesses that tended to corroborate Schubat's testimony concerning Ruhl's involvement. Kristen Koets, Serio's ex-girlfriend, testified that Serio had directed her to obtain a firearm owner's identification card in 2001, even though Koets did not own a firearm and knew nothing about them. Shortly before Christmas, Serio came to Koets' house with Ruhl and had Koets drive the two of them to a sporting goods store. Serio went into the store with Koets, while Ruhl remained in the car, and Serio directed Koets to buy a box of bullets using her firearms identification card. When they returned to the car, Serio told Koets to give the bullets to Ruhl. She then dropped the two of them off at a hotel. Koets also corroborated Schubat's testimony that Serio and Ruhl were frequently together.

In addition, Waukegan police officer Keith Lamanna testified that he stopped a vehicle Serio was driving at 5:17 a.m. on the morning of January 6, 2002, at an intersection in Waukegan, Illinois. Ruhl was his only passenger. Officer Lamanna became suspicious after they told him that they were coming from the north around Round Lake because Round Lake was due west. When asked where they were going, they said they were looking for a restaurant. During a consensual search of the vehicle, Officer Lamanna recovered an open bottle of liquor from the back seat. He confiscated the bottle and poured out its contents, but did not issue any citation or write any report about the incident.

The State also offered evidence intended to show that Schubat could not have driven from the Whip Lash to the Renaissance Faire, where Neubauer's body was found, and

then to her residence in time to make the call to Neubauer's cell phone at 2:43 a.m. on the morning of the murder. Leaving the Whip Lash at 2:20 a.m. (the earliest Neubauer typically arrived to pick Schubat up was 2:15 a.m.), a detective who drove the route without making any stops along the way testified that he arrived at Schubat's house at 2:59 a.m. Based on this evidence, the State argued Schubat could not have assisted Serio in disposing of Neubauer's body.

Because Schubat's testimony was the only evidence directly linking Ruhl to the crime, she was the obvious target of the defense. Ruhl's trial counsel cross-examined Schubat at length and argued that she, not Ruhl, was Serio's accomplice. The defense theory of the case was that Schubat helped Serio kill Neubauer and drove Neubauer's car to the fairgrounds. Ruhl's counsel attempted to establish motive through the testimony of Sandra Morton, Schubat's friend, who claimed that Schubat told her that Neubauer had threatened to take Schubat's child in December 2001. The State countered this evidence with testimony from Schubat and Neubauer's family that the two were happy together after they resumed their relationship, and Neubauer had no intention to seek custody of his daughter. The jury found Ruhl guilty of first-degree murder on February 6, 2003, and he was sentenced to 50 years imprisonment.

Ruhl retained new counsel following his sentencing. On direct appeal to the Illinois Appellate Court, he argued, among other claims, that trial counsel provided ineffective assistance. The appellate court affirmed his conviction, and the Illinois Supreme Court denied his petition for leave to appeal on May 25, 2005. Ruhl filed for post-conviction relief in the circuit court on November 22, 2005, asserting some seventeen ways in

which trial counsel provided deficient representation. The circuit court and appellate court denied relief, and the Illinois Supreme Court denied Ruhl's petition for leave to appeal on March 26, 2008. Ruhl subsequently filed a *pro se* petition for leave to file a successive post-conviction petition in the circuit court, which the circuit court denied. He then filed a motion to reconsider, which the circuit court also denied. The appellate court affirmed, and the Illinois Supreme Court denied Ruhl's petition for leave to appeal on September 29, 2010, making federal habeas corpus his final avenue for relief. The district court found that many of Ruhl's ineffective assistance of counsel claims were procedurally defaulted, and it denied the remainder of his claims on the merits.

Ruhl contends that the district court erred in not issuing the writ because his trial attorney's performance was constitutionally inadequate. On appeal, Ruhl asserts that his trial counsel provided ineffective assistance when he failed to (1) present testimony from two detectives who had voiced concerns about Schubat's credibility; (2) interview and present testimony of several witnesses who would have impeached Schubat's credibility; (3) investigate telephone records to show that Schubat had not called Neubauer's cell phone from a landline phone after she returned home; (4) investigate facts surrounding the traffic stop on the morning of the murder; (5) present expert testimony, which counsel had referenced in his opening statement, that would have undermined the State's case; (6) object to inadmissible hearsay testimony inculpating Ruhl; and (7) present corroborating witnesses at the pretrial hearing on the State's motion to exclude testimony that Serio admitted to shooting Neubauer. The cumulative prejudice of

these errors, Ruhl argues, creates a reasonable probability that, absent counsel's deficient performance, the jury would have acquitted him.

## II.

We review *de novo* the district court's denial of Ruhl's petition, *Emerson v. Shaw*, 575 F.3d 680, 685 (7th Cir. 2009), including whether a petitioner has procedurally defaulted a claim, *Smith v. Gaetz*, 565 F.3d 346, 351 (7th Cir. 2009). Like the district court, our review is also governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d). In conducting federal habeas review under AEDPA, we look to the last reasoned state court opinion addressing each claim. *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). If a state court has adjudicated a petitioner's claim on the merits, habeas relief may only be granted if the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). In order for a federal court to find a state court's application of federal law unreasonable, the court's application must have been more than incorrect; it must have been objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). If no state court has squarely addressed the merits of a habeas claim, we review the claim *de novo* under the pre-AEDPA standard of 28 U.S.C. § 2243, but still with deference to the state court. *Morales v.*

*Johnson*, 659 F.3d 588, 599 (7th Cir. 2011) (internal citations omitted).

Ruhl contends that his conviction was the result of a denial of his Sixth Amendment right to the effective assistance of counsel. A claim of ineffective assistance of counsel is analyzed under the familiar two-prong test of *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687 (1984).

Recognizing the temptation for a defendant "to second-guess counsel's assistance after conviction or adverse sentence," or to conclude that a particular act or omission was unreasonable simply because it was unsuccessful, the Court held in *Strickland* that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. To fairly assess an attorney's performance, it is essential for a court "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate

the conduct from counsel's perspective at the time." *Id*. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (internal citation omitted).

Except in those rare cases in which prejudice is presumed, counsel's deficient performance, by itself, is not enough to warrant relief. "[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692. Moreover, to prove prejudice, it is not enough to show that counsel's errors might have had an effect on the outcome. There must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In sum, to establish ineffective assistance of counsel, a defendant must show (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that counsel's errors affected the outcome of the proceeding. Moreover, in deciding such claims, a court does not need to address the *Strickland* prongs in any particular order. If one prong is found to be insufficient, the court need not address the other prong. *Id.* at 697.

*Strickland* provides the standard we apply on direct review of a claim of ineffective assistance. Where, as here, our review

is of a state conviction under § 2254, we apply AEDPA's deferential standard as well, making our review "doubly" deferential as to those issues ruled on by the state court. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

In this case, the parties dispute which issues must be reviewed under AEDPA's deferential standard and which should be reviewed under the pre-AEDPA *de novo* standard. We need not decide which standard applies because we conclude that even under *Strickland*'s single level of deference, Ruhl's claim fails. We turn now to the specific allegations of counsel's deficient performance that Ruhl contends entitle him to relief.

### A. Failure to Call Detectives Lucci and Hafke

Ruhl first criticizes his attorney for failing to interview and call as witnesses for the defense Kenosha Sheriff's Department Detectives Vincent Lucci and Peggy Hafke. Detectives Lucci and Hafke were the first to confront Schubat with evidence that she was present at the time Neubauer was shot. That evidence consisted of a statement Serio had made to Amanda Barbaro about Neubauer's murder. Barbaro was in custody at the Lake County Jail after she was stopped for a traffic violation on March 28, 2002. Barbaro told the officer who stopped her that Serio had confided to her that he was involved in the murder. Serio told her that Neubauer was shot in the parking lot of the Whip Lash, and that Schubat was

present. Serio said that Schubat was aware it was going to happen because it had been previously planned. Serio also told Barbaro that Ruhl was involved. He told Barbaro that Ruhl moved Neubauer over to the passenger seat after he had been shot in the head and then drove the victim's vehicle to the Renaissance Faire where it was later found. Barbaro repeated the same information to Detectives Lucci and Hafke, and on April 4, 2002, they confronted Schubat with a portion of this information during an interview. It was at that point that Schubat first recounted the version she later gave under oath at Ruhl's trial.

Given Barbaro's statement and Schubat's admitted lies to police before, Detectives Lucci and Hafke were at least initially skeptical of Schubat's claim that she did not know Serio and Ruhl were planning to kill Neubauer. She told the detectives, as she later testified at trial, that she did not take seriously their conversations about killing Neubauer before the murder, and afterwards, she was afraid Serio would harm her daughter if she talked. The detectives noted in their reports that at times, she appeared deceptive. Detective Lucci noted that "[d]uring the interview Denise was very nervous and appeared deceptive when asked various questions that would indicate her possible involvement. She had very little eye contact and squirmed frequently in her chair." As a result, the detectives asked Schubat to take a test called a computer voice stress analyzer (CVSA), which they described as a "truth verification test." Schubat agreed to do so and was transported to the Kenosha County Sheriff's Department to have the test performed. Schubat was told that the test showed she was deceptive in her response to the questions asking if she saw

who shot Neubauer and if she had asked anyone to shoot him. She had answered both questions "No."

Ruhl argues that his trial attorney's failure to interview Detectives Lucci and Hafke and then call them to testify about their observations was objectively unreasonable and prejudicial. He notes that Schubat's credibility was central to the State's case against him. Detective Lucci's statements about Schubat's credibility, Ruhl contends, are "highly relevant." According to Ruhl, "Lucci's observations about Schubat's deception would have supported [counsel's] theory that Schubat, not Ruhl, helped Serio murder Neubauer."

Ruhl's contention that his attorney's failure to interview Detectives Lucci and Hafke prior to trial constitutes ineffective assistance of counsel finds no support in the record. In Illinois, as in most states, "[a] witness is not obligated to speak to an attorney for the other party." *People v. Slabaugh*, 323 Ill. App. 3d 723, 323 Ill. Dec. 544, 753 N.E.2d 1170, 1178 (Ill. App. Ct. 2001). Law enforcement officers write reports in which they record their observations. Ruhl offers no reason to think that either detective would have agreed to be interviewed by his lawyer. Absent such evidence, his argument that counsel was ineffective in failing to interview law enforcement officers involved in the investigation must fail.

Ruhl's argument that counsel was ineffective in failing to call the two detectives as defense witnesses to testify about their opinion that Schubat appeared deceptive during their interview of her is likewise unavailing. "Under Illinois law, it is generally improper to ask one witness to comment directly on the credibility of another witness as questions of credibility

are to be resolved by the trier of fact." *People v. Becker*, 239 Ill. 2d 215, 346 Ill. Dec. 527, 940 N.E.2d 1131, 1143 (Ill. 2010) (internal citations omitted). The fact that the CVSA Schubat underwent indicated deceptiveness to two of the questions that she was asked does not change the result. Illinois does not allow for the admission of polygraph evidence, *People v. Baynes*, 88 Ill. 2d 225, 58 Ill. Dec. 819, 430 N.E.2d 1070, 1077 (Ill. 1981), and there is no reason to believe the CVSA is any more reliable. While the detectives could have testified to Schubat's physical appearance and mannerisms during the interview, Schubat's apparent "nervousness" was easily attributed to the fact that, because of her earlier lies, law enforcement at the time viewed her as a suspect in the murder of the father of her child.

Ruhl also notes, however, that according to Detective Lucci's report of the interview, Schubat admitted that at some point she had told Serio that Neubauer "had beat on her in the past and it would be nice if he was just out of the way." Counsel's failure to elicit the fact that Schubat had made such an admission, Ruhl contends, was also objectively unreasonable under the circumstances and undermines confidence in the outcome of his trial. Had his attorney introduced this evidence, Ruhl contends it would have provided significant support to his theory that Schubat was involved.

In the context of the entire interview, the statement was not the smoking gun Ruhl suggests. Detective Hafke's more detailed account states that Detective Hafke asked Schubat if she ever told Serio that she wanted Neubauer dead. According to Detective Hafke's report, Schubat admitted that "she did

make a comment in the past when she was upset with Rick, such as, '[i]t would be better if he was just gone.'" When Detective Hafke later asked Schubat if it was possible that she asked Serio to kill Neubauer because he was abusive to her and her daughter, Schubat stated that everything was fine between them and denied that he was abusing her. Other witnesses, including Schubat's best friend and Neubauer's mother and sister, corroborated Schubat's testimony that whatever difficulties they had in the past, she and Neubauer were getting along better than ever before after they resumed their relationship. Neubauer's mother, with whom Schubat and Neubauer frequently stayed prior to his death, testified that she had also developed a close relationship with Schubat.

In light of this evidence, Detective Lucci's testimony would have had little effect. Even at best, the evidence would only have suggested that Schubat may have wanted Neubauer out of her life; it did not mean she wanted him killed, and it certainly did not exonerate Ruhl. Under *Strickland*'s deferential standard of review, we find no violation of Ruhl's right to effective assistance of counsel for failing to call Detectives Lucci and Hafke.

## B. Failure to Call Owens and Shoblom

Ruhl next contends that trial counsel provided ineffective assistance because he failed to interview and present the testimony of Jennifer Shoblom and Scott Owens. According to Owens' affidavit, he would have testified that he had known Schubat for twelve years, and during the time she was with Neubauer, "they never seemed stable and she had complained of him being physical from time to time." Owens also stated,

however, that he had not talked with Schubat since she began working at the Whip Lash. Shoblom likewise stated in an affidavit that she had known Schubat a long time, that at some unspecified point in time Neubauer had been verbally abusive to Schubat over the phone, that at the same time she had noticed suspicious bruises on Schubat, and that the relationship between the two was unstable. Additionally, both Owens and Shoblom would have testified that they saw Schubat at gatherings where Serio was also present in the days following Neubauer's murder, and she did not appear frightened of him. Ruhl argues that this evidence would have contradicted the State's argument that Schubat had no motive to kill Neubauer and undermined Schubat's testimony that she was afraid of Serio.

The affidavits of Owens and Shoblom do not establish that his trial attorney was ineffective in failing to call them as witnesses. At the outset, there is no evidence that counsel knew or should have known of Owens before trial. If there is no reason counsel should have known about him, counsel's failure to call him as a witness was not deficient. But even if counsel knew of both Owens and Shoblom and the proposed testimony recounted in their affidavits, his failure to call them as witnesses was not unreasonable. Neither offered any evidence about how Schubat was getting along with Neubauer after they resumed their relationship in late November of 2001. Owens states in his affidavit that he had not spoken with Schubat since she started working at the Whip Lash. And Shoblom likewise says nothing about how Schubat felt about Neubauer after they got back together. Schubat and Neubauer's mother and sister had admitted that the

relationship had been up and down before that time, and neither Owens nor Shoblom added anything that would have been admissible, especially in light of the fact that counsel had called Sandra Morton to make the same point. Shoblom's observation that Schubat had "suspicious" bruises at some point in the past, and Owens' claim that Schubat had at some point complained of Neubauer "being physical from time to time" were both too vague and indefinite to be admissible.

The fact that Owens and Shoblom had seen Schubat and Serio at gatherings after the murder likewise offered little. Neither Owens nor Shoblom say that the two interacted; they only describe two occasions of being at someone's house and noticing that both Schubat and Serio were there. Owens does not say whether Schubat appeared frightened of Serio or not, and while Shoblom states that Schubat did not appear frightened of Serio, she also notes that Schubat seemed "odd, nervous and vomiting a lot." Given the fact that Schubat testified to having seen Serio after the murder, and had even served drinks to a group he was with at the Whip Lash, testimony from Owens and Shoblom would have been at best cumulative. Moreover, because Schubat was following Serio's instructions not to say anything about the murder, she may well have thought she had little reason to fear him at the time.

Finally, Shoblom states in her affidavit that when she went to the Whip Lash on the night Neubauer's body was discovered, she looked through a window on the bar door. Ruhl contends this statement implies that the window was intact and contradicts Schubat's testimony that the window was broken. Although Ruhl describes this as one of the only independently verifiable facts contained in Schubat's

testimony, he reads far more into it than is there. Shoblom does not say the window was intact, and even if she did, it would have mattered little. Schubat never said the window in the bar door was broken. In fact, it is not even clear which window was broken. Regardless, the idea that a window broken on an early January morning in northern Illinois might be repaired by evening of the same day is hardly astounding. As with the other information Owens and Shoblom had to offer, counsel's failure to elicit this evidence was neither deficient nor prejudicial under *Strickland*'s deferential standards.

### C. Failure to Use Telephone Records and Obtain Drive-Time Study

As noted above, in an effort to counter the defense argument that Schubat and not Ruhl was the person who helped Serio dispose of Neubauer's body, the State argued that Schubat could not have driven from the Whip Lash bar to the Renaissance Faire driveway and then back to her home in time to make the call to Neubauer's cell phone. The State offered evidence to confirm that Schubat had called Neubauer's cell phone in the early morning hours of January 6, 2002, and left a message on his voice mail. Detective Kenneth Urquhart was one of the law enforcement officers from the Kenosha County Sheriff's Department that was dispatched to the location where Neubauer's body was found. Detective Urquhart testified that he removed Neubauer's phone from the floor of the car. He listened to the voice mail messages and made a print-out of the outgoing and incoming calls. Detective Urquhart testified that he heard a voice he recognized as Schubat's leave a message at approximately 2:43 a.m. on January 6, 2002, asking "Where are you?" Because Schubat said that she had made the call from

her landline after she arrived home, this meant that if she had driven with Serio to leave Neubauer and the car at the Renaissance Faire, she would have had to be back home by 2:43 a.m. To show she could not have done so, Detective Timothy Jonites had timed how long it would take to drive the same route at the same time of day at a speed of five miles over the limit without stopping along the way. Leaving the Whip Lash bar at 2:20 a.m., Detective Jonites testified that he did not arrive at Schubat's house until 2:59 a.m.

Ruhl argues that his attorney failed to effectively respond to this evidence by using Neubauer's phone records to impeach Schubat and Detective Urquhart and by obtaining an expert drive-time study for the defense. As to the phone records, Ruhl notes that, contrary to the testimony of Schubat and Detective Urquhart, the records show that the voice mail was left at 2:48 a.m., and not 2:43 a.m. More importantly, Ruhl argues, Edens should have pointed out that Neubauer's cell phone records contained no evidence that Neubauer received any calls from Schubat's landline that night. This fact, he contends, would have cast further doubt on Schubat's version of the events of that night and undermined the State's argument that it was virtually impossible for her to have assisted Serio. Ruhl also contends that his attorney should have obtained an expert drive-time study to challenge the findings of Detective Jonites' study. Ruhl claims he paid counsel to hire an investigator to conduct a drive-time study but counsel never produced or utilized an expert study. Instead, counsel argued in closing that jurors should look at a map and determine that Schubat could have arrived home in time to make the call.

It is true that the print-out of the incoming and outgoing calls to Neubauer's phone show an incoming call at 2:48 a.m. instead of 2:43 a.m., and the number shown is not Schubat's landline. The fact that Neubauer's phone records show a call at 2:48 a.m. instead of 2:43 a.m., however, and that they do not list Schubat's home phone number as the originating number does not undermine her credibility. The phone records indicate that Neubauer received a call of 16-second duration at 2:48 a.m. from the phone number 312-907-6245. Although this is not Schubat's home phone number, Detective Kenneth Urquhart noted in his report that this number is shown whenever a caller leaves a voice mail message. In fact, the print-out shows the same number appears for the messages left by Neubauer's mother and father later that morning and everyone else who called and left messages on Neubauer's phone after his death. Presumably, Schubat's home phone records would have shown whether a call was made from her home at that time, but neither party offered them. As to the time of the call, Schubat testified that it was "some time around 2:43 a.m." when she placed the call. Thus, while it is true that Neubauer's phone records do not conclusively establish that the call was placed from Schubat's home, they are perfectly consistent with the call having been placed as Schubat testified. Bringing out these details would not have undermined Schubat's credibility. While it might have somewhat weakened the State's argument that it was impossible for Schubat to have assisted Serio in disposing of Neubauer's body, counsel's failure to do so here is not sufficient to undermine confidence in the result. Whether she made the call at 2:43 a.m. or 2:48 a.m., there still would not

have been enough time for her to help Serio dispose of the body.

Ruhl's argument that counsel erred in failing to obtain an expert drive-time study for the defense also fails. In order for counsel's failure to offer such evidence to constitute ineffective assistance, Ruhl would have to show that the evidence was available and that it would have been helpful to his defense. *See Ellison v. Acevedo*, 593 F.3d 625, 634 (7th Cir. 2010) ("For counsel's performance to be found deficient, the defendant must demonstrate that an expert capable of supporting the defense was reasonably available at the time of trial."). Ruhl has offered no evidence, even at this late date, that a study that would have been helpful to the defense exists or could have been obtained. Detective Jonites testified that it would take Schubat approximately 39 minutes to complete the full trip, even if she turned around immediately at the fairgrounds and consistently exceeded the speed limit. Ruhl's suggestion that a defense study might have shown that the route could have been driven in less time is speculation.

It is true that counsel suggested in his opening statement that such evidence would be forthcoming, but this does not change the result. Counsel argued from a map that there was a more direct route she could have driven and invited the jurors to consult the map themselves. In any event, an unfulfilled suggestion during opening statement that evidence will be coming on a collateral issue is not enough to undermine confidence in the result. For these reasons, counsel's failure to obtain a drive-time study did not constitute ineffective assistance.

### D. Failure to Investigate Traffic Stop

Ruhl also contends that trial counsel was ineffective in failing to locate and interview Officer Lamanna prior to trial. Officer Lamanna was the police officer who stopped Serio and Ruhl at an intersection in Waukegan at 5:17 a.m. on the morning Neubauer was murdered. Although the fact that the two had been stopped by a Waukegan patrol officer that morning was referenced in Barbaro's statement to police, the identity of the officer who conducted the stop was unknown since he did not issue a citation or write a report. The State claimed it was unable to discover the officer's identity until the evening of the first day of trial. It disclosed Officer Lamanna's name to the defense on the morning of the second day of trial and stated it would be calling him as a witness. Counsel objected on the ground that Officer Lamanna had not been disclosed, but the trial court found no prejudice and overruled his objection, conditioned on counsel being given an opportunity to interview the officer before he took the stand. Counsel declined to do so.

Ruhl contends that his attorney provided ineffective assistance in failing to locate and interview Officer Lamanna before trial so as to prepare an effective cross-examination. Instead, counsel promised the jury in his opening statement that there would be no evidence to tie Ruhl "in any way to any of this." Then, after his objection to Officer Lamanna being called as a witness was overruled, Ruhl contends counsel compounded his error by failing to take advantage of the opportunity to interview the officer before he testified.

Counsel was not ineffective in failing to identify and interview Officer Lamanna before trial. Doing so would have only helped the State, since he was the only witness aside from Schubat who could tie Ruhl to Serio on the morning of Neubauer's murder. It was far more reasonable to wait and hope that the State never found him. Ruhl also argues, however, that in light of the fact that counsel knew or should have known about the traffic stop, counsel erred in telling the jury in his opening statement that there was no evidence to tie Ruhl "to any of this." But the fact that Ruhl was with Serio at 5:17 a.m. did not mean that they were together at 2:20 a.m. As noted above, Officer Lamanna's testimony tied Ruhl to Serio; it did not tie Ruhl, at least directly, to the murder. Finally, Ruhl offers no evidence that he suffered prejudice because counsel failed to interview Officer Lamanna before he testified. Absent such evidence, he is not entitled to relief.

### E. Failure to Object to Inadmissible Hearsay

Ruhl contends that counsel's failure to object to Schubat's testimony that she heard Serio planning Neubauer's murder with Ruhl and commanding Ruhl over the phone to shoot Neubauer was objectively unreasonable and constitutes deficient performance within the meaning of *Strickland*. He argues that these statements constitute inadmissible hearsay to which a competent attorney would have objected. Given the "highly inflammatory" character of the testimony, Ruhl argues the prejudice is clear.

In ruling on Ruhl's appeal from the trial court's dismissal of his post conviction petition, the Illinois Appellate Court held that the trial judge did not abuse his discretion in summarily

rejecting Ruhl's claim because the statements were admissible as statements of co-conspirators. Ruhl argues that the appellate court's ruling that the statements were admissible as statements of co-conspirators was unreasonable. More specifically, he contends that the evidence, independent of the statements themselves, was insufficient to establish a conspiracy between Serio and Ruhl.

In essence, Ruhl asks us to overturn the Illinois Appellate Court's determination that the statements were admissible under Illinois law. As a general rule, this is not something we can do. *See Waddington v. Sarausad*, 559 U.S. 179, 192 n.5 (2009) ("[W]e have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'") (quoting *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)); *Huusko v. Jenkins*, 556 F.3d 633, 637 (7th Cir. 2009) ("For a federal court cannot issue a writ of habeas corpus that rests on a belief that a state court has misunderstood or misapplied state law."). Only in very rare cases where the state court's resolution of the evidentiary dispute was clearly unreasonable or otherwise implicates federal constitutional rights has this court granted habeas relief on state law evidentiary questions. *See, e.g., Martin v. Grosshans*, 424 F.3d 588, 591 (7th Cir. 2005) (granting habeas for ineffective assistance of counsel where state appellate court's determination of relevance and prejudice was clearly unreasonable). This is not such a case.

Unlike the federal law governing the admissibility of co-conspirator statements, Illinois law does not permit the court to consider the statements themselves, other than the defendant's own statements, in determining whether a

conspiracy existed. *Compare United States v. Bourjaily*, 483 U.S. 171, 177–78 (1987) (holding that trial judge may consider any evidence whatsoever, including the proffered hearsay statements, in determining whether statements are admissible under the co-conspirator exception to the hearsay rule), *with People v. Coleman*, 399 Ill. App. 3d, 341 Ill. Dec. 660, 931 N.E.2d 268, 271 (Ill. App. 2010) (holding that under Illinois law evidence of the conspiracy must be independent of the declarations made by the co-conspirator in order for the hearsay statements to be admitted under the co-conspiracy exception). Even under Illinois' more limited rule, however, the appellate court's determination of a conspiracy between Serio and Ruhl was far from unreasonable. Schubat's observations prior to and immediately after Neubauer was shot, together with Ruhl's own statements as recounted by Schubat, were more than sufficient to support a finding that Serio and Ruhl conspired to murder Neubauer and dispose of the body. There is no basis for us to overturn the state court's determination that Serio's statements to Ruhl were admissible as statements of a co-conspirator.

Even apart from whether Serio's statements were admissible under the co-conspirator exception to the hearsay rule, they were clearly admissible on other grounds. Serio's statements about his intent to kill Neubauer were admissible as non-testimonial statements of his then existing state of mind. Under the state-of-mind exception, a hearsay statement may be admissible if it "[expresses] the declarant's state of mind at the time of the utterance," i.e., his intentions, plans or motivations. *People v. Lawler*, 142 Ill. 2d 548, 154 Ill. Dec. 674, 568 N.E.2d 895, 900 (Ill. 1991). And Serio's direct order that Ruhl knock on the

car window and shoot Neubauer was not even hearsay. It was a direct command, not a statement offered to prove the truth of the matter asserted. *See United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011) (noting that "a command is not hearsay because it is not an assertion of fact") (citing *United States v. Murphy*, 193 F.3d 1, 5 (1st Cir. 1999)). Moreover, because neither type of statement was testimonial, Ruhl's confrontation rights under the Sixth Amendment were not implicated. *See Davis v. Washington*, 547 U.S. 813, 821 (2006) (holding that only testimonial statements are subject to Confrontation Clause). For all of these reasons, any objections if made would have been properly overruled. Counsel's failure to object to Schubat's recounting of Serio's statements was therefore not unreasonable.

**F. Failure to Present Corroborating Witness at Pretrial Hearing**

Finally, Ruhl contends that counsel provided ineffective assistance by failing to present corroborating evidence at a pretrial hearing on the admissibility of a statement Serio had allegedly made to Marcy McIntosh. According to McIntosh, Serio admitted to her that he had killed Neubauer without mentioning Ruhl. The State filed a motion in limine to exclude McIntosh's testimony on hearsay grounds. At the hearing on the State's motion, McIntosh testified that she knew Serio because she had been both a customer and an employee of the Whip Lash. She was working at the Whip Lash in April 2002 when Serio came into the bar after police had picked him up for questioning about Neubauer's murder. McIntosh said that she asked Serio why police were questioning him since he had nothing to do with it. According to McIntosh, Serio responded:

"What do you mean I had nothing to do with it? I did it." Serio went on to say that he had shot Neubauer once, but that didn't kill him, so he "shot him more times." Serio also said that Neubauer was "a punk" and deserved to die.

Since Serio did not mention Ruhl in his statement to McIntosh, the defense planned to offer his statement as recounted by McIntosh in its defense. Counsel for Ruhl argued that Serio's statement was admissible as a statement against his penal interest under Illinois law and under *Chambers v. Mississippi*, 410 U.S. 284 (1973). *Chambers* held that the Due Process Clause of the Fourteenth Amendment requires the admission of a confession by a third party to the same crime for which the defendant is on trial where the third party's statement carries sufficient indicia of reliability. The *Chambers* court identified four factors to help determine the reliability of a hearsay statement: (1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred; (2) the statement is corroborated by some other evidence; (3) the statement is self-incriminating and against the declarant's interests; and (4) there was adequate opportunity for cross-examination of the declarant. *Id.* at 300–01. Here, the trial judge excluded McIntosh's testimony as unreliable because Serio's relationship with McIntosh was not sufficiently close such that Serio might be expected to confess the commission of a serious crime to her and it lacked corroboration. Ruhl argues that counsel should have presented corroborating testimony from Jim Natywa, McIntosh's fiancé who was also present for the initial part of Serio's admission, and Amanda Barbaro, who could have testified that Serio made a similar admission to her.

Counsel's failure to do so, Ruhl argues, constitutes ineffective assistance.

The Illinois Appellate Court reviewed the trial court's consideration of Serio's confession as a statement against penal interest in its order affirming the trial court's order denying Ruhl leave to file a second petition for post conviction relief. Using *Chambers'* indicia of reliability, the court concluded that Ruhl was not prejudiced by counsel's failure to present Natywa's testimony. The court first noted there was no evidence suggesting that Natywa was more acquainted with Serio than McIntosh. Further, Natywa's testimony would only have corroborated the fact that Serio said that he shot Neubauer, not that Serio actually did shoot him or, what was even more important, that Ruhl was not involved. The court also observed that Natywa's testimony would not have affected the most important consideration to the trial court: whether Serio would be available for cross-examination.

The appellate court's decision is not contrary to, nor does it constitute an unreasonable application of, clearly established federal law. Natywa at most could have corroborated McIntosh's testimony that Serio said that he "killed [Neubauer]," which, given the State's theory of the case, would not have exculpated Ruhl. The State, after all, charged Serio with Neubauer's murder as well as Ruhl. Ruhl suggests that Serio told McIntosh that he killed Neubauer and Ruhl did not. But that is not what Serio said even by McIntosh's account. Serio appears to have exaggerated his own role and left Ruhl's role out. To the extent Ruhl construes Serio's purported statement to McIntosh as exculpating him, it contained none of *Chambers'* indicia of reliability. It was not against Serio's penal

interest, since whether Serio shot Neubauer by himself, or Ruhl did so on Serio's orders, Serio was guilty. The statement was not made shortly after the crime, but some three months later to people with whom Serio apparently had little more than a casual relationship. There was no evidence to corroborate the claim that Ruhl had no involvement, and Serio, having been charged with the same crime, was not subject to cross-examination.

Although the appellate court did not address Ruhl's argument that counsel should have called Barbaro, the decision not to call her was obviously neither deficient nor prejudicial. Barbaro would have testified that Serio said Ruhl was involved too. According to Barbaro, Serio said that Ruhl helped him transport Neubauer's body to the fairgrounds. Thus, Barbaro's testimony would not have corroborated the key fact that Ruhl seeks to read into McIntosh's testimony—namely, that Serio killed Neubauer and he had nothing to do with it. For all of these reasons, counsel's failure to call Natywa and Barbaro to corroborate McIntosh's testimony does not constitute ineffective assistance of counsel.

### III.

In sum, Ruhl has failed to demonstrate that counsel's alleged errors, considered individually or cumulatively, prejudiced his case and rendered his performance constitutionally deficient. This is not to say counsel's representation was perfect. "However, counsel 'need not be perfect, indeed not even very good, to be constitutionally adequate.'" *McAfee v. Thurmer*, 589 F.3d 353, 355–56 (7th Cir. 2009) (quoting *Dean v. Young*, 777 F.2d 1239, 1245 (7th Cir.

1985)). For the reasons set forth above, we conclude that the alleged errors Ruhl attributes to counsel were for the most part not errors at all. To the extent counsel's performance was deficient, there is no reasonable probability that the result would have been different. The judgment of the district court denying the petition is therefore **AFFIRMED**.