In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3241

FRANCISCO CARRION,

*Petitioner-Appellant,*

*v.*

KIM BUTLER,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:13-cv-00778-CJP — **David R. Herndon**, *Judge*.

ARGUED FEBRUARY 11, 2016 — DECIDED AUGUST 31, 2016

Before RIPPLE, KANNE, and WILLIAMS, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Francisco Carrion was convicted of residential burglary and of first-degree murder following a bench trial in the Circuit Court of Cook County, Illinois. The state courts affirmed his conviction on direct appeal and on state postconviction review. Mr. Carrion then filed a habeas petition in federal court under 28 U.S.C. § 2254, in which he raised multiple claims for relief. The district court denied his petition, concluding that although the petition probably was

timely filed, most of the claims were procedurally defaulted and the remaining claims were meritless; the court further declined to grant a certificate of appealability ("COA"). Mr. Carrion then appealed to this court, and we granted a COA instructing the parties to address three questions: whether there was sufficient evidence to support his convictions, whether Mr. Carrion's confession was voluntary, and whether appellate counsel had been ineffective in failing to challenge the voluntariness of his confession.

After briefing and oral argument, we conclude that, whether we apply the deferential review of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), or de novo review, Mr. Carrion is not entitled to relief on any of these claims. There is no question that the State of Illinois met its burden of proving each of the charges beyond a reasonable doubt. We further perceive no due process violation in the reception into evidence of Mr. Carrion's statement, even though it was translated by an investigating officer. Any ambiguities in the statement were examined thoroughly at trial and the state trial court was entitled to admit and rely upon the statement. Accordingly, for the reasons set out more fully in this opinion, we affirm the district court's denial of Mr. Carrion's habeas petition.

# I

# BACKGROUND

## A.

In the early morning hours of July 14, 2001, Francisco Carrion entered the first-floor apartment of sixty-nine-year-old Maryanne Zymali in Palatine, Illinois. Zymali confronted Mr. Carrion, and he stabbed her multiple times causing her

death. At the time of the incident, Mr. Carrion, who lived in an apartment on the floor above Zymali's, was a nineteen-year-old immigrant from Mexico who spoke almost no English. Approximately two weeks after the murder, Mr. Carrion was interviewed in Spanish by Detective Arturo Delgadillo. He denied any involvement with Zymali's death, but he agreed to provide fingerprint samples.

On January 7, 2002, Mr. Carrion was arrested by Detective Delgadillo after his fingerprint was found on a knife recovered from Zymali's apartment. The police took him to the police station, advised him of his *Miranda* rights in Spanish, and then interviewed him twice. Detective Delgadillo conducted the first interview in Spanish; an assistant state's attorney conducted the second interview on camera with Detective Delgadillo acting as translator. On January 31, 2002, the State charged Mr. Carrion with residential burglary under 720 ILCS 5/19-3(a), and three counts of first-degree murder (intentional murder, knowing murder, and felony murder predicated on residential burglary) under 720 ILCS 5/9-1(a). Mr. Carrion waived his right to a jury, and the case proceeded to a bench trial in June 2004.

At trial, the State's forensic scientist testified that Mr. Carrion's fingerprint and palm print were found on a knife recovered from the apartment. The parties then stipulated to the nature of Zymali's injuries, which included stab wounds to her chin and forearm, a stab wound to her chest that "resulted in massive internal hemorrhaging," and "multiple bruises and abrasions" on her thigh, forehead, chin, chest, abdomen,

and right arm.[1] The parties further stipulated that the stab wounds caused Zymali's death.

The State then called Detective Delgadillo to testify. According to the officer, Mr. Carrion stated during the first of the two interviews that, in the early morning of July 14, 2001, after a night of drinking at a nearby bar, he was walking home and noticed a light in Zymali's ground-floor apartment. Mr. Carrion said that he "became curious as to what was inside," and he entered through the open sliding glass door and unlocked screen door.[2] Detective Delgadillo further testified that Mr. Carrion said that he entered the apartment because he was "looking to steal something."[3] While Mr. Carrion "was in the kitchen looking around," he was confronted by Zymali, who "started to attack him, scratching him, kicking him, fight[ing] him and that pretty much a fight ensued, a struggle ensued."[4] The officer further testified that Mr. Carrion told him that Zymali then pulled a knife out of a kitchen drawer, that Mr. Carrion took the knife from her, and that after additional struggle, "he pushed her with both hands," which resulted in his "stabb[ing] her in the stomach area with the knife."[5] According to the officer, Mr. Carrion stated that he then pulled the knife out of Zymali's chest and threw it across

---

[1] R.17-13 at 34–37.

[2] *Id.* at 73.

[3] *Id.* at 73–74.

[4] *Id.* at 74–75.

[5] *Id.* at 76–77.

the room. When Zymali fell to her knees bleeding, Mr. Carrion became scared and ran out of the apartment, "went around the building," "climbed onto his balcony and entered his apartment."[6]

Detective Delgadillo next testified about the second interrogation in which he acted as translator between Mr. Carrion and the assistant state's attorney. He said that on the night of the arrest, Mr. Carrion was taken to meet with an assistant state's attorney and agreed to give a videotaped statement. During this interview, which took place around midnight and lasted half an hour, the prosecutor posed questions in English, and Detective Delgadillo translated the questions to Spanish and then translated Mr. Carrion's responses from Spanish to English. The court admitted into evidence both the video and a transcription of the interview that had been prepared by someone other than Detective Delgadillo.[7] At the conclusion of the officer's testimony, the video interview was played in open court, and the State rested its case.

The defense called three witnesses: Mr. Carrion's friend Brenda Viveros, a certified interpreter named Ruth Ramos, and Mr. Carrion himself. Viveros testified that she was with Mr. Carrion on the night in question and that Mr. Carrion was drunk, that "[h]e was talking funny and just having trouble walking," and that "[h]e asked [her] to take him home because he was not feeling good."[8] On cross-examination,

---

[6] *Id.* at 78.

[7] Neither the videotape nor the transcription are part of the record on appeal. In the district court and in their briefs, the parties have relied solely on the testimony given at trial.

[8] R.17-14 at 37.

Viveros acknowledged that she did not ask the bartender to stop serving Mr. Carrion, nor did she call a cab or arrange a ride for him, but she stated that she did tell another friend of theirs to make sure that Mr. Carrion stopped drinking. Viveros testified that she did not see Mr. Carrion leave the bar, but that she did go looking for him after the bar closed and found him sleeping in his bed in his apartment. Viveros did not see any injuries on Mr. Carrion at that time.

Ramos testified that she reviewed the videotape of Mr. Carrion's interview with the assistant state's attorney several times and prepared her own transcription of the conversation. She went on to testify as follows:

[Mr. Carrion's counsel]:

Q  Do you remember a question put to Francisco Carrion by Detective Delgadillo:

   "Q: And what happened when you got close to your home"?

   Do you remember that question being asked?

A  Yes.

…

Q  All right. Did you hear Francisco Carrion answer that question in Spanish?

A  Yes.

Q  Did you take that answer in Spanish and transcribe it into English?

A  Yes.

Q  What was his answer in English?

A His answer was, [reading from her prepared transcription] "I … well … I look down and I saw a … the apartment and I saw the light on. It seemed like an easy thing to do, I don't know. I became curious … I didn't even know what I was going to do … "

Q Did he finish that answer?

A As far as I remember, when viewing the video, I think his answer was cut off. …

…

Q But he did say, "I don't know. I became curious. I didn't even know what I was going to do it." Is that correct?

A Yes.

Q Do you remember a question put by Delgadillo to Carrion … "When you first came in the apartment, what were you looking for"?

A Yes, I remember the question.

Q Did you hear Francisco Carrion answer that question in Spanish?

A Yes.

…

Q What was that answer?

A Answer, [reading from her prepared transcription] "I didn't even know what I wanted, I just got in to see what thing … just to look around

> … I didn't even know what I was going to take,
>
> it's like … " And then an interruption.[9]

After testifying about specific translated questions and answers, Ramos was asked whether, based on her experience and training as an interpreter, she believed that "Officer Delgadillo's rendering of Francisco Carrion's answers in Spanish to English was truthful, complete, and accurate."[10] Ramos answered:

A  Well, I believe there were some omissions. When the questions … were posed in Spanish, and there were some omissions when the answers were posed in Spanish to be translated into English. I also believe that there were … some errors, grammatical errors in sentence structure in the Spanish language, the way the questions were posed to Mr. Carrion.

Q  Could you consider or would you consider Detective Delgadillo's rendering of Carrion's answers from Spanish to English to be verbatim?

A  Yes.[11]

Ramos further testified on cross-examination:

Q  [W]hen you were able to hear the officer ask, "[Were] you looking for something to take?" You heard the defendant's answer, Carrion's

---

[9] *Id.* at 48–56.

[10] *Id.* at 57.

[11] *Id.*

> answer, "Well … possibly yes. If I had found something that … ," is that correct?

A  Yes.[12]

Mr. Carrion then took the stand. He testified that on the night in question he was heavily intoxicated and that he left the bar for his apartment, noticed the light on in Zymali's apartment, and entered. Mr. Carrion stated that he did not know why he entered the apartment, but he denied intending to steal anything. Mr. Carrion then described the events that occurred after Zymali confronted him. He stated that he injured Zymali in self-defense during the course of a struggle and that Zymali pushed, kicked, and scratched him. He explained that he "grabbed a knife" and that Zymali was injured when he pushed her and "the knife … went inside [her]."[13] Mr. Carrion conceded that he suffered no injuries during the struggle and that, although he knew that Zymali was seriously injured, he did nothing to assist her. Instead, he left Zymali's apartment, climbed onto the balcony of his second-floor apartment, entered through the balcony door, and fell asleep. When asked about his videotaped statement, Mr. Carrion testified that he confessed to entering the apartment with the intent to steal because Detective Delgadillo promised to help him by securing his deportation to Mexico if he did so. On cross-examination, however, Mr. Carrion acknowledged that during the videotaped interview he stated that no one had promised him anything. In closing, the defense contended that there was insufficient evidence that Mr. Carrion entered Zymali's apartment with the intent to

---

[12] *Id.* at 74.

[13] *Id.* at 83–84.

commit theft and that, in stabbing Zymali, he was acting in imperfect self-defense and therefore should only be found guilty of second-degree murder.

At the conclusion of the evidence, the court, ruling orally, found Mr. Carrion guilty on all counts. On the residential burglary charge, the court found that Mr. Carrion entered Zymali's apartment intending to commit a theft. In the court's view, "[t]he most compelling evidence of [Mr. Carrion's] intention to commit a theft [was] his own statement" to that effect during the videotaped interview.[14] Addressing the accuracy of Detective Delgadillo's translation, the court found Ramos's testimony "very credible" and emphasized her opinion that the officer's translation was "verbatim."[15] Based on Mr. Carrion's demeanor and answers, the court said it had "no doubt … from looking at that video that the defendant gave it up."[16] It was immaterial, the court noted, that Mr. Carrion's answers indicated that he "didn't know what he wanted to take" and "wasn't sure what he wanted to get from the apartment" because these statements did "not lessen the intent to commit a theft inside the apartment."[17] The court also rejected Mr. Carrion's claim that Detective Delgadillo promised to have him deported. Finally, the court addressed the circumstantial evidence it found relevant to Mr. Carrion's intent in entering the apartment. It noted that "[i]t was easy for [Mr. Carrion] to enter" the unlocked, first-floor apartment

---

[14] *Id.* at 142.

[15] *Id.* at 149.

[16] *Id.*

[17] *Id.* at 141.

and that he had done so at a very early hour in the morning[18]; it found these circumstances consistent with an intent to commit theft. The court believed that the lack of any traditional burglary evidence was insignificant; in its view, there was no sign of forced entry because the screen door was unlocked, and there was no stacking of property because Mr. Carrion was confronted by Zymali.

Addressing the first-degree murder charges, the court concluded that Mr. Carrion "stabbed [Zymali] repeatedly with an intent to kill, and he then fled."[19] The court emphasized both the force required to cause a stab wound the size of the one to Zymali's abdomen and also the separate stab wounds to Zymali's face and arm. It rejected the defense's theory that Mr. Carrion killed Zymali in self-defense because, in its view, there was no evidence of a struggle "except the defendant's own statement that there was a struggle."[20] The court also rejected Mr. Carrion's intoxication theory as "incredible."[21] It noted that after reaching for a knife and stabbing Zymali several times, "he had the … forethought to escape" and climb up onto the second-floor balcony: "I find it hard to believe he had the ability both physical and mental to do something like that … [y]et he doesn't remember anything at all about this crime until three months later."[22] The court found Mr. Carrion guilty under each of the three theories of

---

[18] *Id.* at 142.

[19] *Id.* at 150.

[20] *Id.* at 146.

[21] *Id.* at 145–47.

[22] *Id.* at 146–47.

first-degree murder presented by the State—intentional murder, knowing murder, and felony murder—but it merged the three counts into one for purposes of sentencing.

After finding Mr. Carrion eligible for the death penalty, the court imposed a fifty-five-year term of imprisonment for first-degree murder and a concurrent fifteen-year-term of imprisonment for residential burglary.

### B.

Mr. Carrion appealed his conviction. His appointed appellate counsel then moved to withdraw under *Anders v. California*, 386 U.S. 738 (1967). In counsel's view, an appeal—including arguments that trial counsel was ineffective and that the evidence was insufficient to support the convictions—would be without arguable merit. Mr. Carrion filed a response. The state appellate court in due course granted the *Anders* motion and affirmed the convictions. Mr. Carrion then filed a petition for leave to appeal ("PLA") to the Illinois Supreme Court that raised only a new claim that appellate counsel provided ineffective assistance. The Illinois Supreme Court denied leave to appeal, and Mr. Carrion did not file a petition for a writ of certiorari.

Mr. Carrion then filed a petition for state postconviction relief raising the following claims: (1) trial counsel was ineffective; (2) there was insufficient evidence to support either conviction; (3) the trial court considered improper factors at sentencing; (4) officers took advantage of his lack of understanding of his rights during interrogation; and (5) appellate counsel was ineffective. The trial court dismissed the postconviction petition. On appeal, Mr. Carrion's appointed counsel moved to withdraw under *Pennsylvania v. Finley*, 481 U.S. 551

(1987), on the ground that all potential issues lacked arguable merit. Counsel's *Finley* brief considered raising arguments about judicial bias at sentencing, the sufficiency of the evidence, the voluntariness of Mr. Carrion's confession given Mr. Carrion's claims that he did not understand his rights and was made a false promise of deportation, and whether Mr. Carrion's trial and appellate counsel provided effective assistance. Counsel concluded: (1) all claims were meritless; (2) that the sufficiency claims and the ineffective assistance claims against trial counsel were barred by res judicata because they were addressed on direct appeal when the appellate court granted the *Anders* motion; (3) that the involuntary confession claim was "barred by *res judicata* because it could have been raised on direct appeal" and, even if it was not barred, was not supported by the record; and (4) that although the ineffective assistance claim against appellate counsel could not have been raised on direct appeal, it was meritless under *Strickland v. Washington*, 466 U.S. 668 (1984).[23]

Mr. Carrion did not file a response, and the state appellate court granted the motion to withdraw on April 13, 2012, explaining that it had "carefully reviewed the record … and the [*Finley*] memorandum" and found "no issues of arguable merit."[24] Mr. Carrion then filed a PLA, which reiterated his judicial bias, sufficiency, ineffective assistance, and involuntary confession claims. The PLA was denied without elaboration on March 27, 2013.

---

[23] R.17-3 at 9–17.

[24] R.1-1 at 82–83.

On July 29, 2013, Mr. Carrion filed a federal habeas petition in the United States District Court for the Southern District of Illinois. He raised the following grounds for relief: (1) there was insufficient evidence at trial to support either the residential burglary or the first-degree murder convictions beyond a reasonable doubt; (2) the trial judge was biased and considered improper evidence at sentencing; (3) trial counsel was ineffective; (4) he was denied due process, equal protection, and access to the courts because he lacked proficiency in English; (5) appellate counsel was ineffective in failing to raise grounds one through four and abandoning Mr. Carrion by filing an *Anders* motion; and (6) postconviction counsel was ineffective in failing to raise all meritorious claims and in abandoning Mr. Carrion by filing a *Finley* motion.[25] The State responded that Mr. Carrion's petition was time-barred, some of his claims were procedurally defaulted, and all of his claims were meritless. The district court denied Mr. Carrion's petition. It reasoned that although the petition probably was timely filed, the first four claims were procedurally defaulted, the fifth claim failed on the merits, and the sixth claim is not grounds for habeas relief under 28 U.S.C. § 2254(i). The court denied a COA.

Mr. Carrion then filed a notice of appeal, which we construed as an application for a COA. We determined that Mr. Carrion had made a substantial showing of a denial of his right to due process and of his right to counsel under the Sixth Amendment. We therefore recruited counsel and instructed the parties to address the following issues: (1) whether the prosecution introduced sufficient evidence of Mr. Carrion's

---

[25] R.1 at 7–16.

intent to convict him of residential burglary and first-degree murder; (2) whether the trial court violated Mr. Carrion's due process rights by relying on a confession elicited from a detective who also acted as Mr. Carrion's translator; (3) whether Mr. Carrion's appellate counsel provided ineffective assistance by not challenging the admission of the confession under the Due Process Clause.

## II

## DISCUSSION

As a general rule, we review the district court's denial of a habeas petition under a de novo standard of review, but that review is governed by the standards set forth in AEDPA. *Ruhl v. Hardy*, 743 F.3d 1083, 1090 (7th Cir. 2014). Here, the State has raised, as it did before the district court, a number of arguments urging us to reject the claims in Mr. Carrion's petition on procedural grounds. Specifically, the State contends, among other things, that Mr. Carrion's federal petition was untimely filed, that his involuntary confession and sufficiency claims are procedurally defaulted, and that his ineffective assistance claim based on a failure to challenge the confession is waived. We need not address these potentially difficult procedural questions, however, because even if we were to decide each of them in Mr. Carrion's favor, his claims clearly fail on the merits.[26]

---

[26] *See* 28 U.S.C. § 2254(b)(2); *Estremera v. United States*, 724 F.3d 773, 775 (7th Cir. 2013) ("[I]t makes sense (and is permissible) to reject a collateral attack on the merits while other procedural defenses, such as [statutes of limitations,] waiver, default, or lack of exhaustion, remain in the background." (citing 28 U.S.C. § 2254(b)(2))); *Johnson v. Pollard*, 559 F.3d 746, 752 (7th Cir. 2009) ("[W]e need not address the procedural default issue

Further, our conclusion is the same regardless of whether we apply the deferential standards of 28 U.S.C. § 2254(d). AEDPA provides that, in conducting our review, "we look to the last reasoned state court opinion addressing each claim." *Ruhl*, 743 F.3d at 1091. Where a claim has been adjudicated on the merits in state court, habeas relief is appropriate only if the state court's determination was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). However, "[i]f no state court has squarely addressed the merits of a habeas claim, we review the claim *de novo* under the pre-AEDPA standard of 28 U.S.C. § 2243, but still with deference to the state court." *Ruhl*, 743 F.3d at 1091. Here, the State has argued that § 2254(d) should apply, contending that Mr. Carrion's claims were rejected on the merits by the state court. Again, we need not decide this issue because even if Mr. Carrion's claims fall outside § 2254(d) and are, therefore, subject to the more generous pre-AEDPA standard of § 2243, they clearly fail on the merits.[27] Therefore,

---

raised by the State because [the petitioner]'s claim clearly fails on the merits."); *see also Brown v. Watters*, 599 F.3d 602, 610 n.10 (7th Cir. 2010) (surveying case law and noting that this practice is in accordance with both Supreme Court precedent and also "the established practice in the other circuits").

[27] *See Ruhl v. Hardy*, 743 F.3d 1083, 1092 (7th Cir. 2014) (declining to decide "which issues must be reviewed under AEDPA's deferential standard and which should be reviewed under the pre-AEDPA *de novo* standard" because petitioner's claim failed even under de novo review); *Johnson*, 559

for purposes of our decision today, we will assume that a de novo standard applies.

**A.**

We first address Mr. Carrion's argument that the record contains insufficient evidence to support, as a matter of law, his convictions for residential burglary and first-degree murder. The familiar standard of *Jackson v. Virginia*, 443 U.S. 307 (1979) makes clear that, to comport with the standards of the Due Process Clause, a criminal conviction must be based on proof beyond a reasonable doubt. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original). In conducting this inquiry, we must "give[] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* It is also important that we evaluate the record evidence "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16.

Turning first to the residential burglary conviction, the *Jackson* inquiry is whether any rational trier of fact could have found beyond a reasonable doubt that Mr. Carrion "knowingly and without authority enter[ed]" Zymali's apartment "with the intent to commit therein a felony or theft." 720 ILCS 5/19-3(a). There is no dispute about the first element, so we

---

F.3d at 753 (declining to decide finally whether Wisconsin state court reached federal merits question because result would be the same under either § 2254(d) or de novo review).

focus on whether there is legally sufficient evidence that Mr. Carrion entered Zymali's apartment intending to commit a theft. *See People v. Maggette*, 747 N.E.2d 339, 353 (Ill. 2001) (observing that "[t]he gist of the offense [of residential burglary] is the defendant's felonious intent with which he or she enters the dwelling"). Mr. Carrion argues that the State failed to prove this element beyond a reasonable doubt because the details of his entry indicate that he did not possess the requisite intent: he was heavily intoxicated; Zymali's apartment was lit and her door was open; he carried no burglary tools; he did not attempt to conceal his entry or verify that the residence was empty; and there was no evidence suggesting that he searched for items of value before the confrontation. In Mr. Carrion's view, this evidence suggests either that he entered the apartment to gain access to the interior of the building or that he was simply drunk and exploring. Alternatively, Mr. Carrion suggests, relying on his own testimony and that of his friend Viveros, that he was so intoxicated that he "ha[d] blacked out" and was incapable of forming the requisite intent at all.[28]

Viewing the evidence in the prosecution's favor, as we are obliged to do, we must conclude that a rational trier of fact could have found beyond a reasonable doubt that Mr. Carrion intended to commit a theft when he entered Zymali's apartment. The state trial court, sitting as the finder of fact, had before it direct evidence of Mr. Carrion's intent in the form of his own videotaped statements, which the court found to be "[t]he most compelling evidence of his intention to commit a

---

[28] Appellant's Br. 39.

theft."[29] Based on the trial evidence, the court was satisfied both that Detective Delgadillo's translations during the videotaped interview were accurate and that Mr. Carrion's testimony that the detective made a false promise of deportation was unbelievable. Relying on Mr. Carrion's statements and his demeanor, the court said that it "ha[d] no doubt … from looking at that video that the defendant gave it up."[30] Further, the incriminating statements in the video aligned with Detective Delgadillo's trial testimony about his initial conversation with Mr. Carrion. The detective testified that Mr. Carrion told him that when he saw a light on in Zymali's apartment he became "curious as to what was inside" and that he entered the apartment because he was "looking to steal something."[31] To be sure, Mr. Carrion's trial testimony differed from Detective Delgadillo's, but it is the trier of fact, not us, that bears "the responsibility … fairly to resolve conflicts in the testimony." *Jackson*, 443 U.S. at 319.

The state trial court also found the circumstantial evidence presented at trial corroborative of Mr. Carrion's incriminating statements. In Illinois, "[c]riminal intent is a state of mind that not only can be inferred from the surrounding circumstances, but usually is so proved." *Maggette*, 747 N.E.2d at 354 (citation omitted). "In a burglary case, the relevant surrounding circumstances include the time, place and manner of entry into the premises, the defendant's activity within the premises, and any alternative explanations offered for his presence."

---

[29] R.17-14 at 142.

[30] *Id.* at 149.

[31] R.17-13 at 73–74.

*People v. Richardson*, 470 N.E.2d 1024, 1027 (Ill. 1984). Here, the trial court noted the late hour of Mr. Carrion's unauthorized entry as well as its view that "[i]t was easy for [Mr. Carrion] to enter [Zymali's] apartment," which was unlocked and located on the first floor of the building.[32] It found the absence of traditional burglary evidence immaterial; in its view, there was no sign of forced entry because the screen door was unlocked, and there was no stacking of property because Mr. Carrion did not have time to canvass the apartment before Zymali confronted him. And the court explicitly rejected Mr. Carrion's alternative explanation that he was so heavily intoxicated that he had simply wandered into Zymali's apartment. In the court's view, there was enough record evidence of Mr. Carrion's mental and physical alertness to render his testimony on this matter "incredible."[33]

Taking both the direct and circumstantial evidence in the light most favorable to the prosecution, we conclude that the trial court certainly was justified in concluding beyond a reasonable doubt that Mr. Carrion entered Zymali's apartment intending to commit a theft and therefore was guilty of residential burglary under Illinois law.

Having concluded that the evidence at trial was sufficient to support Mr. Carrion's conviction for residential burglary under 720 ILCS 5/19-3(a), we also must conclude that his conviction for first-degree murder must stand. In Illinois, felony murder is one of three categories of first-degree murder. Illinois law provides that a person commits first-degree murder

---

[32] R.17-14 at 142.

[33] *Id.* at 145–47.

when, "in performing the acts which cause the death" of an individual, "he is attempting or committing a forcible felony other than second degree murder." 720 ILCS 5/9-1(a)(3). Residential burglary is an enumerated forcible felony under 720 ILCS 5/2-8. Therefore, because Mr. Carrion killed Zymali while attempting to commit residential burglary, he is guilty of first-degree murder under Illinois law.

As we already have noted, the State charged Mr. Carrion under all three categories of first-degree murder in 720 ILCS 5/9-1(a). The court accepted all three theories but merged the counts into a single conviction. Therefore, our conclusion that there is sufficient evidence to support the felony murder charge is sufficient in itself to support the first-degree murder conviction under *Jackson*, regardless of Mr. Carrion's mental state at the time he committed the offense.

**B.**

We now turn to Mr. Carrion's contention that the trial court's admission of his videotaped statement violated his right to due process because Detective Delgadillo's performance as translator during the interview rendered the confession involuntary. A foundational principle of due process of law is that the state cannot procure a criminal conviction through the use of an involuntary confession. *See generally Schneckloth v. Bustamonte*, 412 U.S. 218, 223–26 (1973); *United States v. Stadfeld*, 689 F.3d 705, 709–10 (7th Cir. 2012). An incriminating statement is voluntary "if, in the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004) (internal quotation marks omitted).

"[C]oercive police activity is a 'necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'" *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Thus, to find that a confession is involuntary, we must conclude that it is the product of coercive police activity. Whether a confession is voluntary is a legal question subject to de novo review, although we afford great deference to the trial court's underlying factual findings and will disturb them only in the case of clear error. *Id.*

Upon review of the record, we conclude that Mr. Carrion's confession was not the result of official coercion, and, therefore, its admission did not offend due process.

Mr. Carrion's coercion argument is a rather novel one. A voluntariness inquiry typically requires that we consider a combination of factors.[34] But Mr. Carrion simply contends that when an interrogation is conducted through a translator, due process requires that the translator "be (1) neutral and independent and (2) fully capable of interpreting exactly both

---

[34] In evaluating coercion, relevant factors include

> the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep. Narcotics, alcohol, and fatigue also may be considerations in a particular case.

*United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (citation omitted).

the questions posed and the answers given."[35] Because Detective Delgadillo was not neutral or capable, Mr. Carrion continues, the incriminating statements were necessarily coerced and inadmissible.

Our cases provide no support for the bright line constitutional requirement that Mr. Carrion proposes. The authorities upon which he relies, treatises, state ethics codes, state case law, and agency guidelines, may well suggest the best practice. But our task is decidedly more narrow. Although these sources may be of some help in our inquiry, the basic question before us is not whether the officers in this case adhered to best practices but "whether the circumstances surrounding [Mr. Carrion's] confession would have interfered with his free and deliberate choice of whether to confess." *Johnson v. Pollard*, 559 F.3d 746, 753 (7th Cir. 2009) (internal quotation marks omitted). To be sure, evidence that Detective Delgadillo, in acting as translator, manipulated or mistranslated the prosecutor's questions or Mr. Carrion's answers is relevant to the extent that it demonstrates coercive conduct. In the end, however, the ultimate question is whether, under the totality of the circumstances, Mr. Carrion was deprived of that "free and deliberate choice." *Id.*[36]

---

[35] Appellant's Br. 19.

[36] This comports with our approach in dealing with more traditional arguments of coercive activity. For example, although "deception by an interrogator does not automatically invalidate a confession," *Sotelo v. Ind. State Prison*, 850 F.2d 1244, 1251 (7th Cir. 1988), "[g]iven the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him," *United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009); *see also Hadley*

Mr. Carrion first argues that Detective Delgadillo was so inherently biased that his translation of Mr. Carrion's statements to the assistant state's attorney cannot be properly attributed to Mr. Carrion. Mr. Carrion goes so far as to suggest that Detective Delgadillo served as translator solely to ensure his own "ability to control Carrion's words that would eventually be presented to the court … because [the officers] knew that the only way they would get the confession they needed was if Delgadillo acted as Carrion's mouthpiece."[37] Were these accusations true, they certainly would be relevant to our coercion inquiry. But Mr. Carrion provides no support for his charges of bias. The bare assertion that Detective Delgadillo, as both investigator and translator, could not have acted *neutrally* is insufficient to establish that he acted *coercively*. *See United States v. Lind*, 542 F.2d 598, 599 (2d Cir. 1976) (rejecting involuntary confession argument where Spanish-speaking FBI agent served as translator).

Mr. Carrion also questions Detective Delgadillo's competency as a translator. He relies on the testimony of Ruth Ramos, a language consultant and certified interpreter who reviewed the videotaped interview several times and prepared her own transcription. At trial, Ramos was asked whether,

---

*v. Williams*, 368 F.3d 747, 749 (7th Cir. 2004) (noting that "[a]lthough the law permits the police to pressure and cajole, conceal material facts, and actively mislead, it draws the line at outright fraud" (citation omitted) (internal quotation marks omitted)).

[37] Reply Br. 21.

based on her experience and training, she believed that Detective Delgadillo's translations were "truthful, complete, and accurate."[38] Ramos replied:

> Well, I believe there were some omissions. When the questions … were posed in Spanish, and there were some omissions when the answers were posed in Spanish to be translated into English. I also believe that there were … some errors, grammatical errors in sentence structure in the Spanish language, the way the questions were posed to Mr. Carrion.[39]

These mistakes, Mr. Carrion suggests, altered the meaning of his responses and rendered his confession involuntary.

We cannot accept Mr. Carrion's argument. As an initial matter, it is important to remember that we must view this issue through the lens of the trial court's finding that Detective Delgadillo's translations were accurate, a determination to which we afford great deference. *See United States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008) (stating that historical facts are entitled to deference "especially when the suppression decision turn[s] on the credibility of the witnesses" (alteration in original) (internal quotation marks omitted)). The state trial court noted in its ruling that immediately after Ramos testified about the unspecified omissions and grammatical mistakes, she stated that, despite these errors, it was her opinion that the translations were "verbatim"; the court

---

[38] R.17-14 at 57.

[39] *Id.*

found Ramos's testimony on this matter "very credible."[40] *See United States v. Bernal-Benitez*, 594 F.3d 1303, 1319–20 (11th Cir. 2010) (finding confession voluntary even though officer wrote down the defendant's statement in English, a language the defendant did not speak, because trial court found the officers' accounts of the substance of the interrogation credible).

Furthermore, Mr. Carrion's sole example of a mistranslation does not persuade us that the trial court clearly erred in concluding that Detective Delgadillo's translations were accurate. In the reply brief and at oral argument, appellate defense counsel emphasized that Ramos's and Detective Delgadillo's translations of Mr. Carrion's answer to the question, "Well, you went in there to take something, right?" were in conflict.[41] Counsel argued that Detective Delgadillo translated Mr. Carrion's answer as "Well, I don't know. If I went in there, if I saw something that maybe I would like to take … ," but Ramos testified that Mr. Carrion's answer in fact was "I don't even know what I was going to do when I went in there."[42] This mistranslation, counsel suggested, was determinative at trial of whether Mr. Carrion entered Zymali's apartment with the requisite intent.

The language cited by counsel, however, comes not from the witnesses' testimony but from Mr. Carrion's trial counsel during closing arguments. The actual testimony of Detective Delgadillo and Ramos provides a more complete picture.

---

[40] *Id.* at 149; *see also id.* at 57.

[41] Oral Argument at 00:59–2:06; Reply Br. 23.

[42] Reply Br. 23.

First, Ramos testified that, through Detective Delgadillo, Mr. Carrion was asked the question, "And what happened when you got close to your home [?]"[43] According to her, Mr. Carrion responded, "I … well … I look down and I saw a … the apartment and I saw the light on. It seemed like an easy thing to do, I don't know. I became curious … I didn't even know what I was going to do … ," and then was interrupted.[44] Detective Delgadillo's translation of Mr. Carrion's answer to the same question, however, omitted the final phrase, "I didn't even know what I was going to do."[45] This appears to be the inconsistency to which trial counsel referred in his closing argument and that counsel in this court similarly emphasized, although both counsel misstated the question that was posed.

This discrepancy between the two translations, however, is innocuous when considered in fuller context. During direct examination at trial, Ramos went on to testify about two additional exchanges that took place during the video interview. According to her translation, Mr. Carrion was asked the question, "When you first came in the apartment, what were you looking for [?]"[46] Mr. Carrion answered, "I didn't even know what I wanted, I just got in to see what thing … just to look around … I didn't even know what I was going to take, it's

---

[43] R.17-14 at 54.

[44] *Id*. at 54–55.

[45] *Id.* at 3.

[46] *Id.* at 55.

like … ," and then was interrupted.[47] Detective Delgadillo's translation was essentially the same: "I didn't even know what I was looking for, what I was going to take."[48] Additionally, Ramos testified on cross-examination that the prosecutor asked Mr. Carrion, "[Were] you looking for something to take?"[49] According to her translation, Mr. Carrion responded, "Well … possibly yes. If I had found something that … ."[50] Detective Delgadillo was not asked about this exchange during his testimony.

Upon review of the complete trial testimony, we cannot conclude that the inconsistency that Mr. Carrion has identified between the translations made by Detective Delgadillo and Ramos renders clearly erroneous the trial court's finding that Detective Delgadillo's translations were accurate. *Cf. Lind*, 542 F.2d at 599 (finding confession through Spanish-speaking FBI agent and another individual acting as translators not coerced where agent "[a]t all times … was able to verify the accuracy of the translation").

The totality of the circumstances, therefore, militates in favor of the conclusion that Mr. Carrion's confession was voluntary and that it was not the product of coercion.

---

[47] *Id*. at 56.

[48] *Id.* at 5.

[49] *Id.* at 74.

[50] *Id*.

## C.

Mr. Carrion's final contention derives from his coerced confession argument. He argues that his appointed counsel on direct appeal provided ineffective assistance by failing to challenge the admission of the confession under the Due Process Clause. We have held that "[t]he filing of an *Anders* brief that fails to point out meritorious issues can, in principle, constitute ineffective assistance." *Steward v. Gilmore*, 80 F.3d 1205, 1213 (7th Cir. 1996). However, because we have concluded that Mr. Carrion's involuntary confession claim is without merit, we also reject his related claim of ineffective assistance. *Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013) (rejecting petitioner's argument that court-appointed sentencing counsel was ineffective because "[c]ounsel is not ineffective for failing to raise meritless claims"); *see also United States v. Stewart*, 388 F.3d 1079, 1085 (7th Cir. 2004) ("Stewart's counsel cannot have been ineffective for failing to pursue what we have concluded would have been a meritless [claim]."); *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

## Conclusion

For the foregoing reasons, we affirm the district court's denial of the habeas petition.

AFFIRMED